IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Nancy L. Davis, | ) | C/A No.: 1:16-102-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a

Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)

(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to

obtain judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying her claim for Supplemental Security Income ("SSI"). The two

issues before the court are whether the Commissioner's findings of fact are supported by

substantial evidence and whether she applied the proper legal standards. For the reasons

that follow, the undersigned recommends that the Commissioner's decision be reversed

and remanded for further proceedings as set forth herein.

I.    Relevant Background

    A.    Procedural History

On January 19, 2012, Plaintiff protectively filed an application for SSI in which

she alleged her disability began on January 1, 2012. Tr. at 38 and 94–103. Her

application was denied initially and upon reconsideration. Tr. at 85–87 and 89–93. On

January 30, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ethan A. Chase. Tr. at 394–420 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 20, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 11–26. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at Tr. at 5–9. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 12, 2016. [ECF No. 1].

  B. Plaintiff's Background and Medical History

    1. Background

Plaintiff was 53 years old at the time of the hearing. Tr. at 397. She completed high school. Tr. at 398. Her past relevant work ("PRW") was as a home health aide and a sitter. Tr. at 418. She alleges she has been unable to work since January 1, 2012. Tr. at 94.

    2. Medical History

      a. Evidence Presented to the ALJ

Plaintiff engaged in physical therapy from September 29 through December 3, 2010, at Palmetto Richland Rehab Center. Tr. at 187. She initially reported a constant throbbing pain in her right second metatarsal that increased with prolonged standing. Tr. at 196. On December 3, Nenita Espinosa, PT, DPT ("Ms. Espinosa"), indicated Plaintiff was progressing well with physical therapy and that her pain in her right second metatarsal had decreased to a three on a 10-point scale. Tr. at 187. Ms. Espinosa stated

Plaintiff's strength her right foot had increased from 1/5 to 4/5. *Id.* She indicated Plaintiff could benefit from continued physical therapy. *Id.*

On December 14, 2010, Plaintiff complained of pain and numbness in her toes. Tr. at 186. Chansina Um, DPM ("Dr. Um"), observed Plaintiff to have joint crepitation, edema, and limited range of motion ("ROM") in her right foot. *Id.* He assessed right first metacarpophalangeal capsulitis, right degenerative joint disease, type II diabetes, and limb pain. *Id.* He recommended a cortisone injection into Plaintiff's first metacarpophalangeal joint and instructed her to return to use of closed-toe shoes as tolerated. *Id.*

Plaintiff reported to the emergency room ("ER") at Palmetto Health Richland ("PHR") on January 8, 2011, for low back pain that radiated down the back of both legs. Tr. at 200. Baron T. Mullis, M.D. ("Dr. Mullis"), observed Plaintiff to have full ROM and no spinal deformities, but to be tender to palpation over the paraspinous muscles in the midline of her low back. Tr. at 201. An x-ray showed no fracture or other abnormality. Tr. at 203. Dr. Mullis diagnosed low back pain with sciatica, prescribed Anaprox DS and Flexeril, and instructed Plaintiff to follow up with her primary care physician. Tr. at 201.

Plaintiff presented to consultative examiner Thomas J. Motycka, M.D. ("Dr. Motycka"), for a comprehensive orthopedic examination on May 3, 2011. Tr. at 209. She reported a history of hypertension and right foot fracture. Tr. at 209. She stated she continued to experience foot pain with prolonged ambulation. *Id.* She reported occasional left-sided headaches and hemorrhoids. *Id.* Dr. Motycka indicated Plaintiff "was very

uncooperative and gave poor effort" on orthopedic ROM testing. Tr. at 210. He observed Plaintiff to have slight tenderness to the surgical scar on her right foot; crepitus to the right acromioclavicular joint; and difficulty with toe walking on the right. Tr. at 211. He indicated Plaintiff would only engage in forward flexion of her lumbar spine to 60 degrees. *Id.* Dr. Motycka observed no other abnormalities. Tr. at 211–12.

On May 23, 2011, Plaintiff presented to the ER at Providence Hospital with dizziness and a headache. Tr. at 227. The attending physician observed Plaintiff to have some mild sensory deficit diffusely on the left side, but to be neurologically intact. Tr. at 228. He observed no other abnormalities. *Id.* An electrocardiogram ("EKG") and computed tomography ("CT") scan were normal. Tr. at 229. Plaintiff's lab work was normal, except for an elevated glucose level. *Id.* The attending physician informed Plaintiff that her symptoms were likely the result of a migraine-type headache with some neurological symptoms. *Id.*

Plaintiff presented to the ER at Providence Hospital on July 16, 2011, and reported having experienced a seizure at home. Tr. at 220. Her family members indicated Plaintiff's body went limp for several minutes after she had a staring spell. *Id.* Plaintiff reported no confusion after the incident. *Id.* The attending physician indicated Plaintiff's neurological examination was normal and stated she felt Plaintiff's symptoms were most consistent with an anxiety-type reaction. Tr. at 223.

On November 9, 2011, Plaintiff presented to Tonna Coleman, PA-C ("Ms. Coleman"), at Eau Claire Internal Medicine. Tr. at 262. She reported that she had experienced intense, sharp chest pain that radiated to her right shoulder while standing in

line at Walmart. *Id.* She stated she had experienced chest pain throughout the remainder of that day and part of the next day. *Id.* She complained of feeling sluggish and tired since the incident. *Id.* Ms. Coleman observed no abnormalities on examination. Tr. at 263. She indicated she would refer Plaintiff to cardiology for the chest pain. Tr. at 264.

Plaintiff reported daily headaches on December 15, 2011. Tr. at 256. Plaintiff complained of difficulty finding her words, mild facial numbness and tingling, and decreased left arm strength. Tr. at 257. Ms. Coleman indicated Plaintiff had normal ROM of all joints and an intact motor and sensory examination. *Id.* She referred Plaintiff to a neurologist. Tr. at 259.

On January 6, 2012, Plaintiff reported that her headaches had improved, but complained of back pain that radiated to her feet and increased anxiety. Tr. at 254. She stated she had not experienced a seizure since July 2011. *Id.* Ms. Coleman prescribed Naproxen for pain and Doxepin for depression and indicated Plaintiff's depression may be contributing to her back pain. Tr. at 254 and 255.

Plaintiff presented to the ER at Providence Hospital on March 9, 2012. Tr. at 214. She complained of anxiety, headache, and chest pain and stated she passed out. *Id.* The attending physician indicated Plaintiff likely had a tension headache and prescribed Ibuprofen and Lorazepam. Tr. at 217–18.

On March 19, 2012, Plaintiff complained to Ms. Coleman of headaches and elevated blood pressure. Tr. at 249. Ms. Coleman increased Metformin to the maximum dosage and prescribed two milligrams of Avandia. *Id.*

Plaintiff attended an individual psychiatric therapy session with Shenelle Bowman, LPC ("Ms. Bowman"), on March 20, 2012. Tr. at 248–49. Ms. Bowman assessed moderate recurrent major depression and anxiety disorder, not otherwise specified ("NOS"). Tr. at 249.

State agency medical consultant Warren F. Holland, M.D. ("Dr. Holland"), reviewed the evidence and completed a physical residual functional capacity ("RFC") assessment on April 16, 2012. Tr. at 34–36. He indicated Plaintiff had the RFC to occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about six hours in an eight-hour day; sit for about six hours in an eight-hour day; and should avoid concentrated exposure to hazards. *Id.*

Plaintiff presented to consultative examiner Kimberly K. Kruse, Psy. D. ("Dr. Kruse"), for a mental status examination on April 19, 2012. Tr. at 231–33. Dr. Kruse observed Plaintiff to be alert and oriented. Tr. at 232. She noted Plaintiff's psychomotor activity was "somewhat retarded." *Id.* She described Plaintiff's mood as lethargic with restricted affect. *Id.* Plaintiff spoke slowly and with a soft volume, but maintained a normal tone and rhythm. *Id.* Her thought processes were logical, linear, and goal-directed, but she did not provide much detail. *Id.* Dr. Kruse described Plaintiff's eye contact as "poor to nonexistent" and noted that she kept her eyes closed for much of the interview. Tr. at 231 and 232. She was unable to estimate Plaintiff's intelligence. *Id.* She deemed Plaintiff's performance on the St. Louis University Mental Status Examination to be invalidated by her poor effort. *Id.* She ended the interview early because "the patient does not appear to be giving appropriate effort for a valid estimation of her mental status

functioning." *Id.* Dr. Kruse's diagnostic impressions were "[r]ule out malingering," "[r]ule out anxiety," and "[r]ule out depression." *Id.*

Plaintiff complained of a knot under her chin and pain and swelling in her jaw and throat on April 25, 2012. Tr. at 245. She reported fatigue, chills, and decreased appetite. *Id.* Ms. Coleman observed Plaintiff to have swelling in her right thyroid and lymph nodes. Tr. at 246. She referred Plaintiff to an endocrinologist and for a thyroid ultrasound. Tr. at 248.

On May 7, 2012, state agency consultant Samuel Goots, Ph. D. ("Dr. Goots"), reviewed the record and completed a psychiatric review technique form ("PRTF"). Tr. at 32–33. He considered Listing 12.06 for anxiety-related disorders and found that Plaintiff had mild restriction of activities of daily living ("ADLs"); mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. Tr. at 32. He determined that Plaintiff's mental condition was non-severe and did not impose work-related functional limitations. Tr. at 33. State agency psychologist Jeanne Wright, Ph. D. ("Dr. Wright"), also assessed Plaintiff as having mild restriction of ADLs; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. Tr. at 45.

On June 6, 2012, Plaintiff complained that her legs were aching and that she had occasional blurred vision. Tr. at 241. Ms. Coleman noted a tender submandibular lymphadenopathy on Plaintiff's neck, but found no other abnormalities. Tr. at 242–43.

She recommended a thyroid ultrasound and referred Plaintiff to Midlands Eye Clinic. Tr. at 244.

Plaintiff attended an individual psychiatric therapy session with Ms. Bowman on June 12, 2012. Tr. at 240–41.

Plaintiff presented to Woodrow A. Bell, M.D. ("Dr. Bell") at Eau Claire Internal Medicine, with a four-day history of stomach pain on July 14, 2012. Tr. at 238. Dr. Bell observed no abnormalities on examination. Tr. at 239. He prescribed Omeprazole for acid reflux. Tr. at 240.

On July 25, 2012, Plaintiff denied feeling tired or poorly and reported to Ms. Coleman that her stomach pain had improved with use of Omeprazole and that the knot on her neck had disappeared. Tr. at 236. Plaintiff's hemoglobin A1c was elevated, but was in the normal range for diabetic patients. Tr. at 237. Her thyroid-stimulating hormone level was also elevated, and Ms. Coleman adjusted her medication. *Id.*

Plaintiff attended an individual therapy session with Ms. Bowman on July 31, 2012. Tr. at 382.

Plaintiff complained of pain in her back and bilateral legs on September 12, 2012. Tr. at 378. She indicated the pain had been present for ten days and was worsened by sitting for a prolonged period and trying to stand. *Id.* Plaintiff also endorsed paresthesias in her fingers. *Id.* Ms. Coleman observed Plaintiff to have no abnormalities on musculoskeletal or neurological examinations. *Id.* She advised Plaintiff to take Naproxen and to avoid bending at the waist and sitting for prolonged periods. Tr. at 380.

On October 2, 2012, Ms. Coleman completed paperwork for Plaintiff to receive a disabled placard. Tr. at 378. She indicated Plaintiff had arthritis and knee pain with walking. *Id.*

Plaintiff presented to Ms. Bowman for individual psychiatric therapy on October 2 and 23, 2012. Tr. at 377, 378.

Plaintiff presented for an eye examination on October 29, 2012. Tr. at 267. Optometrist Kendria L. Cartledge, OD ("Dr. Cartledge"), diagnosed bilateral hyperopia, bilateral presbyopia, decreased visual acuity, and retinal problems related to diabetes and hypertension. *Id.* Plaintiff had a slight reduction in her ability to detect colors and poor responses on refraction. *Id.* She complained that she was "starting to get [a] headache" during the exam. *Id.* Dr. Cartledge stated that Plaintiff should avoid work activity that requires precise distance, near vision, color vision, and small objects. Tr. at 269.

Plaintiff visited Ms. Bowman for individual psychiatric therapy on November 8, 2012. Tr. at 377.

On November 9, 2012, state agency medical consultant Lindsey Crumlin, M.D. ("Dr. Crumlin"), completed a physical RFC assessment. Tr. at 46–49. She indicated Plaintiff was limited as described in Dr. Holland's RFC assessment, but also indicated she was unable to perform jobs that required color discrepancy. *Id.*

Plaintiff presented to Ms. Bowman for individual psychiatric therapy on December 12, 2012. Tr. at 376.

Plaintiff presented to Deborah L. Struchen, APRN ("Ms. Struchen"), at Eau Claire Internal Medicine for a headache with sharp pain to the left side of her head. Tr. at 373–

74. Ms. Struchen observed Plaintiff to have sinus tenderness and boggy turbinates. Tr. at 375. She diagnosed acute frontal sinusitis. *Id.*

Plaintiff presented to Elizabeth Knight, APRN ("Ms. Knight"), at Eau Claire Internal Medicine on February 28, 2013. Tr. at 368. She complained of intermittent numbness and tingling in the left side of her face that seemed to be brought on by "aggravation." Tr. at 369. She stated she had experienced a grand mal seizure two months earlier, but indicated she was not seen in the ER at that time. *Id.* Ms. Knight observed Plaintiff to have abnormal facial sensation to touch on the left side, but she indicated Plaintiff had no motor dysfunction, and had normal gait and stance, and a euthymic mood. Tr. at 370. She recommended lab work and an MRI of Plaintiff's head. Tr. at 371.

On March 15, 2013, Plaintiff presented to the ER at Providence Hospital with complaints of dizziness and facial tingling and swelling. Tr. at 281. She reported intermittent bitemporal headaches that had been occurring for months and were accompanied by left-sided facial pain, numbness, and swelling. *Id.* Michael Thomas Hayes, M.D., noted no abnormalities on examination. Tr. at 283–84. He indicated Plaintiff's neurological examination, a CT of her head, and her lab work were all within normal limits. Tr. at 284. He diagnosed a possible migraine with aura and recommended that Plaintiff follow up with her primary care physician and a neurologist. *Id.*

Plaintiff presented to the ER at Fairfield Memorial Hospital on April 6, 2013, with a syncopal episode after she became upset during a funeral. Tr. at 272. The attending physician indicated diagnostic impressions of syncope and epileptic seizure. *Id.*

Plaintiff followed up with Dr. Bell on April 15, 2013. Tr. at 365. Dr. Bell observed no abnormalities on physical examination. Tr. at 366. Lab work revealed Plaintiff to have high glucose and sodium levels. Tr. at 366–67. Dr. Bell refilled Plaintiff's medications and instructed her to follow up in three months. Tr. at 367.

Plaintiff presented to Dr. Bell with a severe headache on May 14, 2013. Tr. at 362. Dr. Bell observed Plaintiff to have muscle tenderness in her lower more than her upper extremities. *Id.* He assessed diabetes, tension headaches, myalgia, myositis, and moderate recurrent major depression. Tr. at 364.

On June 17, 2013, Plaintiff presented to the ER at Providence Hospital with a headache and burning on the left side of her face. Tr. at 274. She reported a loss of consciousness and a seizure after getting into an argument with her children. *Id.* Jose Luis Gonzalez, M.D., indicated he suspected Plaintiff's symptoms were "all secondary to stress." Tr. at 277.

Plaintiff was admitted to PHR for observation from August 5 through August 9, 2013. Tr. at 298. She was hospitalized after being inattentive and unable to speak for approximately 45 minutes. *Id.* A CT of Plaintiff's brain showed no acute bleed, but indicated an area of hypodensity in the left temporal area. Tr. at 299. An EKG was normal. *Id.* A CT angiogram showed no major vessel stenosis. *Id.* Neurologist Paisith Piriyawat, M.D. ("Dr. Piriyawat"), indicated Plaintiff's sudden loss of speech and possible loss of strength were potential signs of cerebrovascular disease, particularly in light of her history of hypertension and diabetes. *Id.* He recommended Plaintiff be given Aspirin and undergo magnetic resonance imaging ("MRI") and possible

11

electroencephalogram ("EEG"). Tr. at 299 and 307. Her son informed the attending physician, Leigh J. Hawn, M.D. ("Dr. Hawn"), that Plaintiff had demonstrated similar symptoms during other stressful points in her life. Tr. at 304. Dr. Hawn indicated she suspected Plaintiff's symptoms were "more of a hysteria anxiety-related issue." Tr. at 305.

Plaintiff presented to Eau Claire Internal Medicine for hospital follow up on August 12, 2013. Tr. at 359. She reported experiencing a lot of stress since her father's death. *Id.* Ms. Knight noted that Plaintiff had been discharged from Eau Claire Behavioral Medicine because of noncompliance in keeping her appointments. *Id.* She observed no abnormalities on examination. Tr. at 360–61. She assessed anxiety disorder, NOS, and prescribed Valium. Tr. at 361.

On August 15, 2013, Plaintiff reported a headache, arm twitching, and blurred vision. Tr. at 356. She also complained of a bilateral frontal headache that had been ongoing for months. *Id.* Dr. Bell observed no abnormalities on physical examination, aside from dull, pink tympanic membranes. Tr. at 357–58. He stated the jerking movement of Plaintiff's right hand did not appear to be consistent with seizure activity. Tr. at 358. He indicated Plaintiff's headaches were likely tension headaches and advised her to stop Fioricet and to start Naproxen. *Id.*

Plaintiff was again admitted to PHR from September 2 to September 6, 2013, for sudden-onset speech difficulty and suspected syncope. Tr. at 319. Dr. Piriyawat indicated an MRI was negative for acute ischemia while Plaintiff was symptomatic. Tr. at 320. He stated the MRI report confirmed that Plaintiff's speech difficulty was a non-

12

cerebrovascular disorder. *Id.* Plaintiff underwent a tilt-table test, but the results were normal. Tr. at 330. She was found to have low sodium, potassium, and magnesium levels, which were corrected during her hospitalization. *Id.* Mila Bordecia, M.D. indicated that Plaintiff's presentation was likely the result of situational adjustment disorder and recommended Plaintiff follow up with a psychiatrist and a counselor. Tr. at 337.

On November 18, 2013, Plaintiff reported to Columbia Area Mental Health for an initial visit. Tr. at 350. She reported depressive symptoms that had occurred on and off since she was a teenager. *Id.* She indicated her symptoms included anhedonia, emotional and social withdrawal, crying spells, low energy, and suicidal ideations. *Id.* Juliet R. Igama, M.D. ("Dr. Igama"), described Plaintiff as having guarded behavior and poor judgment and insight. *Id.* She diagnosed recurrent, severe major depressive disorder without psychotic features and assessed a global assessment of functioning ("GAF")[1] score of 45.[2] Tr. at 351.

On December 2, 2013, Plaintiff indicated she enjoyed spending time with her family on Thanksgiving and had experienced a partial improvement in her depressive symptoms. Tr. at 348. Dr. Igama indicated Plaintiff had poor insight and judgment, but

---

[1] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[2] A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV-TR.*

noted no other abnormalities in her mental status. *Id.* She indicated Plaintiff was partially responding to her medications and that her depressive symptoms had decreased. Tr. at 349. She assessed a GAF score of 55.[3]

On December 17, 2012, Plaintiff complained of a foul-smelling rash under her breasts and in the lower part of her stomach. Tr. at 352. She requested a handicapped sticker. *Id.* Dr. Bell observed no abnormalities on examination. Tr. at 352–53. He diagnosed cutaneous candidiasis. *Id.*

b.    Evidence Presented to Appeals Council

On June 24, 2014, Dr. Bell completed a form labeled "PHYSICAL CAPACITIES EVALUATION." Tr. at 390–91. He circled and checked the following limitations: sit for one hour during an eight-hour day; stand/walk for one hour during an eight-hour day; needs an opportunity to alternate sitting and standing at will throughout the day; occasionally lift/carry zero to 10 pounds; never lift over 10 pounds; occasionally balance, stoop, and reach above shoulder level; and never climb, kneel, crouch, or crawl. *Id.* He stated Plaintiff was mildly restricted from exposure to dust, fumes, and gases; moderately restricted from exposure to marked changes in temperature and humidity; severely restricted from exposure to moving machinery and driving automotive equipment; and totally restricted from exposure to unprotected heights. Tr. at 391. However, he indicated Plaintiff could use her bilateral hands to engage in simple grasping, pushing, pulling, fine manipulation, and repetitive motion tasks. Tr. at 390. He noted Plaintiff suffered from

---

[3] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR*.

fatigue as a result of "myalgia (fibromyalgia-like condition)." Tr. at 391. He indicated Plaintiff's fatigue was severe enough to prevent her from working full-time in a sedentary position. *Id.*

Dr. Bell completed a second form on the same day that was labeled "PHYSICAL EFFECTS OF PAIN." Tr. at 392. He indicated Plaintiff suffered from pain and wrote that "[p]t has myalgia related to fibromyalgia-like condition." *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on January 30, 2014, Plaintiff testified she stopped working in 2010 because she fell and was having seizures. Tr. at 398. She indicated she had seizures approximately every two months. Tr. at 400. She stated her seizures sometimes lasted for 10 to 15 minutes and that she sometimes felt them coming on. *Id.* She indicated she could comprehend what was going on around her during a seizure, but was unable to react. Tr. at 401.

Plaintiff testified that her seizures were brought on by anxiety. *Id.* She indicated she was prescribed medication for anxiety, but denied that it helped her symptoms. Tr. at 406. She stated she saw shadows where there should be no shadows and felt like people were coming through her television. *Id.* She indicated she had difficulty sleeping at night because she was afraid that something was coming into her bed. *Id.* She testified she had crying spells every couple of days. Tr. at 414. She indicated she heard voices calling her name and telling her that she did not want to live. *Id.* She endorsed suicidal thoughts. *Id.*

She indicated she did not want to be around other people. Tr. at 415. She stated she experienced anxiety attacks in which her heartbeat increased and she felt like others were looking at her and talking about her. *Id.* She testified she had reported these problems to her psychiatric providers. Tr. at 406–07.

Plaintiff endorsed pain in her low back that was exacerbated by sitting in a hard chair for a prolonged period. Tr. at 401 and 402. She indicated her pain increased her stress. Tr. at 402. She testified she experienced pain in both of her legs, but that her right leg was more painful than her left. Tr. at 403. She stated her seizures and pain caused her blood pressure to become elevated, which resulted in dizziness and impaired balance. Tr. at 404. Plaintiff also stated she had diabetes and a history of thyroid surgery, but denied having any related symptoms. *Id.* She indicated she experienced throbbing pain in her hands and arms on a daily basis. Tr. at 408. She stated she had headaches once or twice a week that lasted for up to 12 hours. Tr. at 408–09. She complained of numbness in her arms, hands, and feet that was exacerbated by sitting and lying down. Tr. at 409. She indicated she had broken her right foot and undergone surgery in 2010. Tr. at 410.

Plaintiff testified she could sit in an office chair for 15 to 20 minutes at a time. Tr. at 412. She estimated she could stand for no more than 15 to 20 minutes. *Id.* She indicated she could lift a maximum of five pounds. *Id.* She stated she could sit in an office chair for a maximum of one hour in an eight-hour workday. *Id.* She estimated she could walk for 15 to 30 yards before she became weak and her legs gave out. Tr. at 413. She stated her medications caused her to feel sleepy. *Id.*

Plaintiff testified she lived with her son. Tr. at 399. She stated she no longer drove because a doctor at PHR advised her not to drive. *Id.* She indicated she had difficulty sleeping and generally slept for four hours per night. Tr. at 410–11, 412. She stated she spent most of her day sitting in a recliner or an armchair. Tr. at 411. She indicated her son prepared meals. Tr. at 413. She testified she occasionally visited the grocery store with her son, but used a motorized cart. *Id.* She indicated she had difficulty showering and getting in and out of the bathtub without assistance. Tr. at 413–14.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Carroll Crawford reviewed the record and testified at the hearing. Tr. at 417–19. The VE categorized Plaintiff's PRW as a home health aide, *Dictionary of Occupational Titles* ("*DOT*") number 355.674-014, as requiring medium exertion with a specific vocational preparation ("SVP") of four and a sitter, *DOT* number 309.677-010, as requiring light exertion with an SVP of three. Tr. at 418. The ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited to work at the light exertional level with the following additional limitations: occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; no climbing of ladders, ropes, or scaffolds; must avoid hazards, unprotected heights, and driving; limited to unskilled work with an SVP of one or two; low stress; no fast-paced production requirements; only occasional changes in the work setting; only occasional decision making; and only occasional interaction with coworkers and the general public. *Id.* The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the regional or

17

national economy that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of two as a garment sorter, *DOT* number 222.687-014, with 1,400 positions in South Carolina and 98,000 positions nationwide; a garment folder, *DOT* number 789.687-066, with 1,600 positions in South Carolina and 142,000 positions nationwide; and a clerical messenger, *DOT* number 230.663-010, with 1,000 positions in South Carolina and 77,000 positions nationwide. Tr. at 418–19. The ALJ next asked the VE to assume the hypothetical individual would miss about four days of work per month and asked if the number of absences would be acceptable in the identified jobs. Tr. at 419. The VE testified that four absences per month would be considered unacceptable. *Id.*

Plaintiff's attorney asked the VE to consider the same limitations in the first hypothetical question, but to further assume the individual would be unable to bend at the waist or sit for prolonged periods. *Id.* He asked how the additional limitations would affect the jobs identified in response to the first hypothetical question. *Id.* The VE testified that an individual would be unable to perform light work if she were unable to bend at the waist. *Id.*

### 2.     The ALJ's Findings

In his decision dated May 20, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since January 19, 2012, the application date (20 CFR 416.971 *et seq.*).
2.    The claimant has the following severe impairments: seizure disorder, osteoarthritis, affective disorder, and anxiety disorder (20 CFR 416.920(c)).
3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

18

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except no more than occasional balancing, bending, stooping, crouching, crawling, or climbing of stairs/ramps; no climbing of ladders, ropes or scaffolds; avoidance of hazards such as heights and driving; limited to unskilled, low stress work that entails no fast-paced production requirements with only occasional changes in the work setting and occasional decision making; and no more than occasional interaction with the public and co-workers.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on March 24, 1960 and was 51 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since January 19, 2012, the date the application was filed (20 CFR 416.920(g)).

Tr. at 16–25.

II.    Discussion

Plaintiff alleges the Commissioner erred in finding that she was not disabled. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such

---

[4]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v.*

impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

*Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

Plaintiff has failed to submit a brief setting forth the Commissioner's alleged errors.[6] However, because Plaintiff is proceeding pro se, the court is charged with liberally construing her complaint to allow for the development of a potentially meritorious claim.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Evans v. Commissioner of Social Security Administration*, --- F. App'x ---, 2016 WL 6575081 (4th Cir. 2016) (remanding case because Plaintiff's complaint could be liberally construed to raise the possibility that he sought relief in the form of a writ of mandamus). Accordingly, the undersigned construes Plaintiff's complaint as challenging whether the ALJ properly considered the effects of all her impairments and whether his decision is supported by substantial evidence. For the reasons set forth below, the undersigned recommends a finding that the case be remanded.

1.    The ALJ's Decision

The undersigned has considered whether the ALJ's findings were supported by substantial evidence at each step of the sequential evaluation process.

---

[6] Plaintiff's brief was due by August 1, 2016. [ECF No. 16]. On August 8, 2016, the undersigned issued an order directing Plaintiff to file a brief detailing the legal merits of her claim by August 22, 2016, and warning that a failure to file a brief may result in a recommendation that the case be dismissed with prejudice for failure to prosecute. [ECF No. 18]. Plaintiff failed to file a brief, and on August 24, 2016, the undersigned directed the Commissioner to file a brief supporting her decision. [ECF No. 21].

### a.    Step One

Plaintiff's testimony and earnings records indicate she last worked in 2010. *See* Tr. at 104, 105, and 398. Therefore, substantial evidence supports the ALJ's finding at the first step that Plaintiff had not engaged in substantial gainful activity since January 19, 2012, the date of her SSI application. *See* Tr. at 16.

### b.    Step Two

A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* SSR 96-3p. A non-severe impairment "must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, citing SSR 85-28; *see also* 20 C.F.R. § 416.921(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.[7]").

An ALJ's recognition of a single severe impairment at step two ensures that he will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). Therefore, this court has found no reversible error where the ALJ neglected to find an impairment to be severe at step two provided that he

---

[7] Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 416.921(b).

considered that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

At step two, the ALJ found that Plaintiff's severe impairments included seizure disorder, osteoarthritis, affective disorder, and anxiety disorder. *See id.* The ALJ did not consider the visual impairments that Dr. Cartledge diagnosed at step two. *See* Tr. at 267 (diagnosing bilateral hyperopia, bilateral presbyopia, decreased visual acuity, and retinal problems related to diabetes and hypertension). *Id.* However, his failure to find Plaintiff's visual impairments to be severe at step two was not harmful unless he failed to consider the functional effects of her visual impairments in determining her RFC.

### c.    Step Three

"At step three, the ALJ either finds that the claimant is disabled because her impairments match a listed impairment or continues the analysis." *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015). "The ALJ cannot deny benefits at this step." *Id.* "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis added). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also meet the criteria found in the Listing of that impairment. 20 C.F.R. § 404.1525(d). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. 20 C.F.R. § 404.1508. The Commissioner can also determine that the claimant's impairments are medically equivalent to a Listing, which occurs when an

impairment is at least equal in severity and duration to the criteria of a Listing. 20 C.F.R. § 404.1526(a).

The undersigned's review of the record reveals that substantial evidence supports the ALJ's finding that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ adequately considered Listings 12.04 and 12.06. Tr. at 17–18. The record does not include signs or symptoms that suggest Plaintiff met or equaled any of the other Listings.

d.     Steps Four and Five

The Commissioner argues that substantial evidence supported the RFC assessed by the ALJ and his determination that Plaintiff did not meet the requirements for a finding of disability under the Social Security Act. [ECF No. 24 at 1–2]. She maintains the ALJ's explanation for his RFC finding included a discussion of Plaintiff's severe impairments, the treatment she received, the functional limitations she alleged, and the objective clinical findings. *Id.* at 4–5.

Before determining whether a claimant is capable of performing her PRW or other work that exists in the economy, the ALJ must determine the claimant's RFC. 20 C.F.R. § 416.920(e). To adequately assess a claimant's RFC, the ALJ must determine the limitations imposed by her impairments and how those limitations affect her ability to perform work-related physical and mental abilities on a regular and continuing basis. SSR 96-8p. The ALJ should consider all the claimant's allegations of physical and mental limitations and restrictions, including those that result from severe and non-severe

impairments. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636, citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

Dr. Cartledge specified that Plaintiff should avoid work activity that required precise distance, near vision, color vision, and small objects because of her visual impairments. Tr. at 269. Dr. Crumlin found that Plaintiff was limited in her ability to perform jobs that required color discrepancy. Tr. at 47. The ALJ was not required to adopt Dr. Cartledge's or Dr. Crumlin's proposed limitations, but he was required to address their medical opinions[8] and explain how he considered the functional limitations they identified in determining Plaintiff's RFC. *See* 20 C.F.R. § 404.1527(b), (c) (providing that ALJs must consider and evaluate every medical opinion in the record).

---

[8] Dr. Cartledge, a licensed optometrist, and Dr. Crumlin, a physician, are considered "acceptable medical sources" under the regulations. 20 C.F.R. § 416.913(a). Acceptable medical sources may render medical opinions. *See* SSR 96-5p and 20 C.F.R. § 416.927(a).

Although the ALJ summarized some of Dr. Cartledge's findings, he neither accepted nor rejected the functional limitations she suggested were imposed by Plaintiff's visual impairments. *See* Tr. at 20. He indicated he gave "great weight" to the state agency medical consultants, but he did not address Dr. Crumlin's specific opinion or her indication that Plaintiff's visual impairment resulted in some functional limitation. *See* Tr. at 23. The ALJ's RFC assessment is flawed based on his failure to assess Plaintiff's capacity to perform relevant functions. *See Mascio*, 780 F.3d at 636. Therefore, the undersigned recommends the court find that remand is appropriate.

2.    Evidence Presented to Appeals Council

The undersigned has also evaluated whether the Appeals Council adequately considered Dr. Bell's opinion.

A claimant may submit additional evidence that was not before the ALJ at the time of the hearing, along with a request for review of the ALJ's decision. *Meyer v. Astrue,* 662 F.3d 700, 705 (4th Cir. 2011), citing 20 C.F.R. § 404.967. However, the evidence must be both "new" and "material" and the Appeals Council may only consider the additional evidence "where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 416.1470(b). If new and material evidence is offered and it pertains to the period on or before the date of the ALJ's hearing decision, the Appeals Council should evaluate it as part of the entire record. *Id.* After reviewing the new and material evidence and all other evidence of record, the Appeals Council will either issue its own decision or remand the claim to the ALJ if it concludes that the ALJ's "action, findings, or conclusion" was "contrary to the weight of the

evidence." *Meyer*, 662 F.3d at 705, citing 20 C.F.R. § 404.970(b). However, if after considering all the evidence, the Appeals Council decides that the ALJ's actions, findings, and conclusions were supported by the weight of the evidence, the Appeals Council will deny review and is not obligated to explain its rationale. *Id.* at 705–06.

"In reviewing the Appeals Council's evaluation of new and material evidence, the touchstone of the Fourth Circuit's analysis has been whether the record, combined with the new evidence, 'provides an adequate explanation of [the Commissioner's] decision.'" *Turner v. Colvin*, No. 0:14-228-DCN, 2015 WL 751522, at *5 (D.S.C. Feb. 23, 2015), citing *Meyer*, 662 F.3d at 707 (quoting *DeLoatche v. Heckler*, 715 F.3d 148, 150 (4th Cir. 1983)). After reviewing new evidence submitted to the Appeals Council, the court should affirm the ALJ's decision to deny benefits where "substantial evidence support[ed] the ALJ's findings." *Id.*, citing *Smith v. Chater*, 99 F.3d 635, 638–39 (4th Cir. 1996). However, if a review of the record as a whole shows the new evidence supported Plaintiff's claim and was not refuted by other evidence of record, the court should reverse the ALJ's decision and find it to be unsupported by substantial evidence. *Id.*, citing *Wilkins v. Secretary, Department of Health and Human Services*, 953 F.3d 93, 96 (4th Cir. 1991). If the addition of the new evidence to the record does not allow the court to determine whether substantial evidence supported the ALJ's denial of benefits, the court should remand the case for further fact finding. *Id.*

The Appeals Council accepted Dr. Bell's opinion as new and material evidence, but found that it did not provide a basis for changing the ALJ's decision. *See* Tr. at 6. The

Appeals Council did not explain its rationale and declined to remand the case for the ALJ to specifically consider the opinion.

In *Meyer*, 662 F.3d at 707, the court found that the Appeals Council erred in failing to remand the case to the ALJ for consideration of the plaintiff's treating physician's opinion. The court noted that "[t]he ALJ emphasized that the record before it lacked 'restrictions placed on the claimant by a treating physician,' suggesting that this evidentiary gap played a role in its decision." *Meyer*, 662 F.3d at 707. In the instant case, the ALJ similarly specified in his decision that "no physician treating the claimant has suggested specific functional limitations for her," except to the extent that they had recommended she receive a handicapped placard. Tr. at 23. Dr. Bell was Plaintiff's treating physician. *See* Tr. at 238–40, 356–58, 362–64, and 365–67. Because it appears the ALJ's decision was influenced to some extent by the absence of a medical opinion from Plaintiff's treating physician, the Appeals Council should have either remanded the case for the ALJ to consider Dr. Bell's opinion or issued its own opinion that addressed the treating physician's opinion. *See Meyer*, 662 F.3d at 707 ("Thus, no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record."). Therefore, the undersigned recommends the court remand the case for further fact finding.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is

supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

November 17, 2016                         Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).